IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,
ex rel. RYAN P. NOONAN,

    Plaintiffs,

vs.

ABRY PARTNERS, INC.;
ABRY PARTNERS, LLC;
RIVERSIDE PARTNERS, LLC
NORTH AMERICAN DENTAL GROUP, LLC;
NORTH AMERICAN DENTAL
MANAGEMENT, LLC;
JOHN HUNT;
T.J. ROSE;
ROBERT DOYLE, DMD;
ANDREW MATTA, DMD;
COLE CONBOY, DMD;
KENNETH COOPER;
KRISTEN KERNS;
ARMANDA LESTER;
BRYAN ZIMMERMAN, DMD;
N. STEPHEN WILSON, DMD;
EMORY FOOTE, DMD;
JERRY KOLOSIONEK, DMD;
HISHAM BAZIN, DMD;
ERIC SNYDER, DMD;
SHARON OKEZIE, DMD;
DANIEL HAGHIGI, DMD;
JOHN MARSHALL, DMD;
JOHN LU, DMD;
ALAP CHOKSEY, DMD;
WILLIAM CHOI, DMD;
WILSON MOROCHO, DMD;
PARAMVIR DHARIWAL, DMD; and,
HAWAZIN KHEDHER, DMD;

    Defendants.

Civil Action No.: 2. 20-CV-56

**COMPLAINT**

**FILED IN CAMERA AND
UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX**

**DO NOT ENTER ON PACER**

FILED

APR 17 2020

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

1

"Medicare and Medicaid cost roughly a trillion dollars per year. And with trillions of dollars comes the temptation for fraud."

*U.S. ex. rel. Bookwalter v. UPMC,* 946 F.3d 162, 165 (3rd Cir. 2019)

## COMPLAINT

The United States of America, by and through *qui tam* relator Ryan P. Noonan, suing also in his direct capacity, brings this action under the False Claims Act, 31 U.S.C. §§ 3729-3732, to recover mandatory civil penalties, treble damages and other remedies, and in furtherance thereof avers that:

## I.    INTRODUCTION

1.    In this Medicaid fraud case, people in the private equity business bribed noncredentialed dentist employees to provide non-reimbursable services to thousands of Medicaid patients. Patient records were falsified to conceal that noncredentialed dentists had provided the services, and to falsely say that credentialed dentists had provided the services instead. Complicit actors then presented thousands of false claims to Medicaid for the non-reimbursable services provided by the noncredentialed dentists using the names, National Practitioner Identifiers ("NPIs"), Medicaid numbers and Tax Identification numbers of credentialed dentists, who were all paid bribes for referring their patients and cooperating in the scheme. As a result of these fraudulent acts, Medicaid paid thousands of claims that it otherwise would have denied. After collecting these payments, those responsible for the scheme lied about what they had done and kept money that rightfully belonged to the United States taxpayer.

2

2.      Under 31 U.S.C. § 3729(a)(1)(A), it is unlawful to "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval" to a federal grantee, contractor or other recipient of federal money in connection with a federally funded program.

3.      Under § 3729(a)(1)(B), it is unlawful to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim."

4.      Under § 3729(a)(1)(G), it is unlawful to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to an obligation to pay or transmit money … to the Government, or [to] knowingly conceal[] or knowingly and improperly avoid[] or decrease[] an obligation to pay or transmit … to the Government."

5.      Under § 3729(a)(1)(C), it is unlawful to "conspire to commit a violation" of §§ 3729(a)(1)(A), (B) or (G).

6.      Under the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), whoever knowingly and willfully receives remuneration (including any kickback, bribe or rebate) in return for referring a patient to another for services to be paid by Medicaid, and whoever knowingly and willfully offers or pays remuneration (including any kickback, bribe or rebate) to any person to induce them to make such a referral, is guilty of a felony. Under 42 U.S.C. § 1320a-7(b)(g), "a claim that includes… services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act.

7.      Under 42 U.S. Code § 1320a–7k(d), any person who has received an overpayment from the Medicaid program must (a) report the overpayment to appropriate authorities and return the overpayment, and (b) notify appropriate authorities in writing of the reason for the overpayment, not later than 60 days after the date on which the overpayment is identified, or the

3

date any corresponding cost report is due, if applicable. Any overpayment retained after this deadline is an "obligation" under §§ 3729(b)(3) and (a)(1)(G) of the False Claims Act.

8.  Combinations of Defendants violated each of these laws as detailed below.

9.  The United States seeks mandatory statutory penalties in an amount not less than $10,781 nor more than $21,563 (or the inflation adjusted penalties in effect at the time of trial) for each violation of §§ 3729(a)(a)(A), (B) and (C), plus an amount equal to three times the damages the United States sustained because of Defendants' violations, plus costs and attorney fees.

10.  Under 31 U.S.C. § 3730(d), Relator seeks his statutory share of the United States' recovery plus costs and attorney fees.

11.  To the extent any other person has brought an action against Defendants under 31 U.S.C. § 3730(b) which is currently pending, this action is unrelated to that action, does not state or incorporate any of the material facts of that action, and sets forth different material facts based on different evidence that give rise to distinct claims and separate recoveries by the United States.

12.  This action is not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party.

13.  No "public disclosure" has occurred under 31 U.S.C. § 3730(e)(4)(A). If such public disclosure has occurred, then Relator is an "original source" under 31 U.S.C. § 3730(e)(4)(B) both because Relator is an individual who (a) prior to such public disclosure voluntarily disclosed to the Government the information on which the allegations or transactions underlying the claims in this litigation are based, and because (b) Relator has knowledge that is

4

independent of and that materially adds to any publicly disclosed allegations or transactions, and Relator voluntarily provided this information to the United Stated before filing this action.

14.    As required by 31 U.S.C. § 3730(b)(2), Relator disclosed in writing to the Attorney General of the United States and the United States Attorney for the Western District of Pennsylvania all material evidence and information related to this Complaint.  Because Relator's disclosure includes attorney-client communications and the work product of Relator and his attorneys, and was submitted to the Attorney General and to the United States Attorney in their capacities as potential co-counsel, it is privileged.

## II.    JURISDICTION and VENUE

15.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345.

16.    This Court has personal jurisdiction over each Defendant under 31 U.S.C. § 3732(a) because each Defendant has availed itself of the privileges and protections of United States law and can reasonably anticipate being involved in litigation in the United States.

17.    Venue is proper in the Western District of Pennsylvania pursuant to 31 U.S.C. § 3732(a) because at least one Defendant can be found and/or transacts business in this District.

18.    This Complaint was filed under seal and remained sealed for a period of at least sixty (60) days and was not served on the Defendants, pending the Court's order.

## III.    PARTIES

## A.    Relator

19.    Relator Ryan P. Noonan is an adult person domiciled in Ohio and the former Vice President of Operations - East Ohio and Pennsylvania of Defendant North American Dental Management, LLC ("NADM") who worked for NADM from May, 2018 through September, 2019.

**B.    Organizational Defendants**

**1.    Private equity Defendants**

20.    Abry Partners, Inc. and Abry Partners, LLC (collectively "API") are private equity firms based in Boston, Massachusetts, organized under Delaware law, whose registered agent is Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, New Castle, Delaware, 19801, and whose principal office is located at 888 Boylston, Suite 1600, Boston Massachusetts, 02199.

21.    API is the advisor/manager of a private equity fund which owned a controlling stake in Defendant North American Dental Group, LLC ("NADG"), its predecessor Refresh Dental Holdings, LLC ("RDH"), and its subsidiary North American Dental Management, LLC ("NADM"), from May, 2012 through August, 2019.

22.    A controlled and related Abry entity was the general partner of a limited partnership associated with the fund.

23.    API partners John Hunt and T.J. Rose were officers/directors of the fund, the general partner, and of NADG/NADM.

24.    At all times material to this action, API managed, directed and controlled the fund, the limited partnership, NADG and NADM.

25.    Riverside Partners, LLC d/b/a The Riverside Company ("Riverside") is a private equity firm based in Boston, Massachusetts organized under Massachusetts law whose registered agent is David L. Belluck, Manager, One Exeter Plaza c/o Riverside Partners, Inc., Boston, Massachusetts, 02116, and whose principal office is at 800 Boylston, Suite 1590, Boston, Massachusetts, 02199.  Riverside co-invested in NADG along with API, helping it manage and control the operations of NADG and NADM from August, 2015 through August, 2019.

6

### 2.    Portfolio Defendants

26.    North American Dental Management, LLC f/k/a Refresh Dental Management, LLC t/d/b/a Refresh Dental Shaker Heights, Refresh Dental Middleburg Heights, Refresh Dental Medina, Refresh Dental Willoughby Hills, Refresh Dental Kent, Refresh Dental Whitehall, Refresh Dental Westlake, Corner Dental Talmadge, Corner Dental Maumee and North American Dental Group, is a Dental Support Organization ("DSO") based in Pittsburgh with offices at 11 S. Mill Street, Suite 200, New Castle, PA, 16101 and 125 Enterprise Drive, Suite 200, Pittsburgh, PA, 15275. NADM's registered agent is Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, OH 43215.

27.    North American Dental Group, LLC ("NADG") is a Delaware limited liability company f/n/a Refresh Dental Holdings, LLC that maintains the same offices and registered agent as NADM.

28.    NADG is the sole equity owner of NADM.

29.    NADG and NADM have interrelated operations, common executives and management, centralized control over employees, and are controlled by common persons and entities.

30.    At all times material to this action, the organizational Defendants acted through their authorized executives, managers, agents and employees, who were acting within the course and scope of their agency.

7

## C.    Individual Defendants

### 1.    Abry partner Defendants

31.    John Hunt is an adult person domiciled in Massachusetts and Managing Partner of API who managed, controlled and directed an API sponsored private equity fund, the general partner in that fund, and both RDH and NADG, on behalf of API as more fully described below.

32.    T.J. Rose is an adult person domiciled in Massachusetts and a partner of API who managed, controlled and directed an API sponsored private equity fund, the general partner in that fund, and both RDH and NADG, on behalf of API as more fully described below.

### 2.    NADG/NADM executive Defendants

33.    Kenneth Cooper co-founded NADG and NADM's predecessor RDH with Defendant Matta, is the Chief Executive Officer of NADG and NADM, and works in the Western District of Pennsylvania.

34.    Robert Doyle, DMD is the founder and operator of CDC Steubenville, LLC, CDC Shadyside, LLC, CDC Newcomerstown, LLC, CDC Martins Ferry, LLC, CDC Dennison, LLC, CDC Champion Heights, LLC, CDC Calcutta, LLC (collectively "CDC entities") which did business under the trade name Complete Dental Care.  Doyle is a co-owner, executive and agent of Defendants NADM and NADG.  At all times material to this action, Doyle was the head of the "Optimization Team" described more fully below.

35.    Andrew Matta, DMD, is a co-founder, co-owner and the Chief Medical Officer of NADM and NADG, and the founder and co-owner of the Professional Dental Alliance constellation of entities, who works and resides in the Western District of Pennsylvania.

36.    Kristen Kerns is the Chief Operating Officer of NADM and works and resides in the Western District of Pennsylvania.

8

37.     Armanda Lester is a Regional Director of Operations of NADM who lives and works in Ohio and is an agent of NADG, NADM and the CDC entities identified above.  At all times material to this action, Lester was a member of the "Optimization Team."

### 3.      Dentist Defendants

38.     Cole Conboy, DMD is a co-owner and agent of Defendants NADM and NADG, and an agent of the CDC entities, who works and resides in the State of Ohio.  At all times material to this action, Conboy was a member of the "Optimization Team."

39.     Bryan Zimmerman, DMD is a dentist domiciled in Ohio who worked at Refresh Dental Shaker Heights at 16651 Chagrin Boulevard, Shaker Heights, OH 44120.

40.     N. Stephen Wilson, DMD is a dentist domiciled in Ohio who worked at Refresh Dental Shaker Heights at 16651 Chagrin Boulevard, Shaker Heights, OH 44120.

41.     Emory Foote, DMD is a dentist domiciled in Ohio who worked at Refresh Dental Shaker Heights at 16651 Chagrin Boulevard, Shaker Heights, OH 44120.

42.     Jerry Kolosionek, DMD is a dentist domiciled in Ohio and a co-owner of NADM and NADG who worked at Refresh Dental Shaker Heights at 16651 Chagrin Boulevard, Shaker Heights, OH 44120 and at Refresh Dental Willoughby Hills, 27291 Chardon Road, Willoughby Hills, OH 44092.

43.     Hisham Bazin, DMD is a dentist domiciled in OH who worked at Refresh Dental Shaker Heights at 16651 Chagrin Boulevard, Shaker Heights, OH 44120.

44.     Eric Snyder, DMD is a dentist domiciled in Ohio and a co-owner of NADM/NADG who worked at Refresh Dental Middleburg Heights, 7043 Pearl Road, Middleburg Heights, OH 44130.

9

45.    Sharon Okezie, DMD  is a dentist domiciled in Ohio who worked at Refresh Dental Middleburg Heights, 7043 Pearl Road, Middleburg Heights, OH 44130.

46.    Daniel Haghighi, DMD is a dentist domiciled in Ohio who worked at Refresh Dental Middleburg Heights, 7043 Pearl Road, Middleburg Heights, OH 44130.

47.    John Marshall, DMD is a dentist domiciled in Ohio who worked at Refresh Dental Medina, 2736 Medina Road, Suite 114, Medina, OH 44256.

48.    John Lu, DMD is a dentist domiciled in Ohio and co-owner of NADM and NADG who worked at Refresh Dental Medina, 2736 Medina Road, Suite 114, Medina, OH 44256.

49.    Alap Choksey, DMD is a dentist domiciled in Ohio with an office at Corner Dental, 4321 Talmadge Rd # 2, Toledo, OH 43623.  Choksey is a co-owner and the Chief Professional Officer of Defendants NADM and NADG.

50.    William Choi, DMD is a dentist domiciled in Ohio with an office at Corner Dental, 447 W Dussel Dr, Maumee, OH 43537 and is a co-owner of NADM and NADG.

51.    Wilson Morocho, DMD is a dentist domiciled in Ohio with an office at Corner Dental, 3246 Navarre Ave. Oregon, OH 43616.

52.    Paramvir Dhariwal, DMD is a dentist domiciled in Ohio with an office at River East Dental Group, 725 Miami St, Toledo, OH 43605 and is a co-owner of NADM and NADG.

53.    Hawazin Khedher, DMD is a dentist domiciled in Michigan who worked for Professional Dental Alliance of Michigan, PLLC t/d/b/a Dental Care of Michigan Advanced Warren at its office at 27600 Hoover Rd., Warren, MI 48093.

## IV.    THE MEDICAID PROGRAM

### A.    Generally

54.    Medicaid is the program of medical assistance established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. that provides health insurance including dental for low income families, children, pregnant women and people who are aged, blind or who have disabilities.  Medicaid is jointly administered by the States and the federal government, but primarily funded by the United States.  In 2018, the United States spent $370 Billion on the Medicaid program.

55.    The United States spends roughly $15 Billion on Medicaid in Ohio to provide health insurance to 3 Million Ohioans.

56.    9 in 10 Ohioans access Medicaid through Ohio Medicaid or a health plan provided by a Managed Care Organization ("MCO") contracted with the Ohio Department of Medicaid ("ODM").

57.    The MCOs relevant to this action are CareSource, DentaQuest, Aetna, Buckeye Health, Paramount Healthcare, Molina Healthcare and United Healthcare.

58.    The United States provides funds to these MCOs to pay for services by eligible providers to Medicaid beneficiaries.

### B.    Conditions for provider reimbursement

#### 1.    An ODM Provider Agreement and Ohio Medicaid Number

59.    In Ohio, no provider service is reimbursable by Medicaid unless performed by an eligible provider.  Ohio Admin. Code § 5160-1-17.

60.     No provider is an eligible provider unless approved by ODM as evidenced by a signed Provider Agreement and issuance of an Ohio Medicaid provider number.  Id. at § 5160-1-17(A)(4).

61.     A Provider Agreement is a contract between ODM and the provider of Medicaid covered services.  Ohio Admin. Code § 5160-1-17.2.

62.     Provider agreements are mandated by federal law. 42 C.F.R. § 431.107.

63.     Dentists employed by or under contract with a group practice must have an individual provider agreement with ODM.  Id. at § 5160-1-17©(4).

## 2.     An individual NPI

64.     Eligible providers who submit claims to ODM must have a National Provider Identifier ("NPI").  Id. at § 5160-1-17(D)(1).  The NPI is the standard unique health identifier for healthcare providers consisting of a 10 digit number assigned by the National Provider System. 45 C.F.R. §§ 162.406-408.  See also, 45 C.F.R. § 162.410(a) (requiring health care provider to obtain an NPI and use it when furnishing or billing for health care services).

65.     "The name and NPI of the practitioner who furnishes services to Medicaid recipients shall be on claims submitted to ODM for reimbursement."  Id. at § 5160-1-17(D)(3). *See also*, 42 U.S. Code § 1320a–7k(e) (requiring provider to include NPI on all claims for payment); 42 C.F.R. § 431.107(b) (in agreement with State Medicaid agency, provider or organization must "include its NPI on all claims submitted under the Medicaid program."); 42 C.F.R. § 455.440 ("The State Medicaid agency must require all claims for payment for items and services that were ordered or referred to contain the National Provider Identifier (NPI) of the physician or other professional who ordered or referred such items or services.").

66.   Ohio's Medicaid MCOs all have a similar rule.  CareSource, for example, tells its member providers, "Your National Provider Identifier (NPI) number and Tax Identification Number (TIN) are required on all claims.  Claims submitted without these numbers will be rejected."  DentaQuest likewise requires an accurate identification of the treating dentist on its electronic claims portal.

**3.   Approved credentials and contract with each Ohio Medicaid MCO**

67.   A provider cannot bill an Ohio Medicaid MCO for services unless and until the MCO has credentialed and contracted the provider.  See generally, 39 Ohio Rev. Code § 3963.05-06.

68.   Providers must apply for credentials.

69.   Applicants first complete an Ohio Department of Insurance Standard Credentialing Form application, plus the attachments to the application.

70.   Applicants must also submit a number of documents such as a current, unrestricted license to practice, current, valid DEA certificate, education and training locations and dates, work history from the time of graduation, professional liability claims history, references and similar information.

71.   After an applicant submits a complete application, the Ohio Medicaid MCO queries the National Practitioner Data Bank (NPDB)/Healthcare Integrity and Protection Data Bank (HIPDB), and checks for sanctions and other disciplinary actions.

72.   Once an applicant's information has been verified, the MCO through its Medical Director, CMO or Credentials Committee reviews all information in the credentials file, and makes a recommendation to the MCO's Governing Body on whether to approve the applicant as a participating MCO provider.

73. After being credentialed, a provider must still receive and execute a contract with the Ohio Medicaid MCO before the provider may begin treating the MCO's members.

74. Having a Provider Agreement with and Medicaid Provider number from ODM, and being credentialed and contracted with Ohio Medicaid MCOs, are mandatory conditions for the payment of claims under the Ohio Medicaid program.

### 4. Express and implied certifications of compliance

75. On every claim submitted for payment to Medicaid, the provider must sign and certify that the information on the claim "is true, accurate and complete." 42 C.F.R. § 455.18(a)(1).

76. The provider must further certify that he or she "understand[s] that payment of this claim will be from Federal and State funds, and that any falsification or concealment of a material fact, may be prosecuted under Federal and State laws." Id. at § 455.18(a)(2).

77. By signing a Provider Agreement, the provider agrees to comply with the terms of the provider agreement, Revised Code, Administrative Code, and federal statutes and rules. Ohio Admin. Code § 5160-1-17.2.

78. The provider further certifies and agrees to submit claims only for services actually performed, and to maintain all records necessary and in such form so as to fully disclose the extent of services performed. Id. at § 5160-1-17.2(A) and (D).

79. ODM will act to terminate a provider agreement if a provider does not fully and accurately disclose information required by the provider agreement, any rule contained in § 5160 of the Administrative Code, or any provisions contained in 42 C.F.R. Part 455, Subpart B, or makes false statements, provides false information, or alters records, documents or charts, or has failed to abide by or comply with the terms and conditions of a provider agreement, or has by act

14

or omission negatively affected the fiscal or programmatic integrity of the Medicaid program, or if the provider or provider's staff bills for or receives payment for services not rendered, or has engaged in any other practice that violates any rule contained in § 5160 of the Administrative Code. Ohio Admin. Code §§ 5160-1-17.6(G)(3),(8),(10),13) and (18).[1]

## V.    FACTS

### A.    API buys NADG intending to grow it and sell it for profit

80.    Matta and Cooper co-founded the DSO now known as NADG as Refresh Dental Holdings, LLC ("RDH") in or around 2010.

---

[1]    Ohio defines Medicaid fraud as "an intentional deception, false statement, or misrepresentation made by a person with the knowledge that the deception, false statement, or misrepresentation could result in some unauthorized benefit to oneself or another person. It includes any act that constitutes fraud under applicable federal or state law." Ohio Admin. Code § 5160-1-29(A)(1).

Provider-related Medicaid fraud also includes misrepresentation as to services provided, quantity provided, date of service, who performed the service or to whom services were provided, billing for services not provided, collusive activities involving the Medicaid program between a Medicaid provider and any person or business entity, misrepresenting by commission or omission any information on the provider enrollment and revalidation application, provider agreement, or any documentation supplied by the provider to ODM, and any action which would constitute a violation of the False Claims Act, 31 U.S.C. §§ 3729-3733. Ohio Admin. Code §§ 5160-1-29(c)(2), (3), (7), (10) and (12).

81.    In 2012, API made a controlling investment in RDH through an API sponsored private equity fund.[2]

82.    API's investment in RDG was leveraged and the debt was secured by RDG's operating revenue and assets.

---

[2]    Private equity firms sponsor private equity funds.  A private equity fund is an investment vehicle with a finite time horizon used by wealthy investors.

Private equity transactions almost always follow a "buy to sell" model.  The private equity firm causes the fund to borrow money to buy operating portfolio companies using the cash flow and assets of the portfolio companies as collateral.  The debt to equity ratio in these transactions can be as high as 4:1 or 5:1 and annual interest rates can run as high as 15%. Repayment is the responsibility of the portfolio companies; their cash flow is used to service the debt from the leveraged buyout which can take years to pay off.

In the meantime, the private equity firm deeply involves itself in day-to-day management and operations of the portfolio company, believing it can drive growth and profitability, allowing it to sell the company at a later date at a substantial profit.  The private equity firm and fund own and control their portfolio companies, appoint their boards of directors, hire and fire top executives and set business strategy.

Most private equity funds are structured as limited partnerships.  Individual partners in the private equity firm assume the role of General Partner ("GP") of the fund, which manages the fund and controls it.  Most of the fund's equity comes from passive investors who are the fund's Limited Partners (LPs).

The GP and the fund it controls often attempt to increase the value of a portfolio company by growing it.  One way the GP and fund can grow a portfolio company is by causing it to borrow money to purchase other companies.  These other companies are typically operating companies in the same or a substantially related line of business as the portfolio company.  The owner of such a company sells its assets to the portfolio company in exchange for a cash payment financed by debt and may also receive a small amount of equity in the portfolio company.  As part of the transaction, the debt that financed the cash payment is transferred to the acquired company, which becomes responsible for servicing and repaying it.

Over time, the debt burden on a portfolio company and its acquired entities can become tremendous.  At any given moment on any given day, the portfolio company and its acquired entities are under immense pressure to meet revenue targets to service and repay their debts, to pay management fees to the fund and/or the GP, and to support a high price when their private equity owner exits and sells the portfolio company to another investor.

16

83.    API created a separate entity to serve as the general partner of the fund ("API GP").

84.    Two of API's partners, John Hunt and T.J. Rose, were appointed as officers and directors of API GP.

85.    Hunt and Rose were also appointed as officers and/or directors of RDH.

86.    Because API controlled and managed the fund and API GP, API also controlled and managed RDH.

87.    Through the fund's controlling stake in RDH, API controlled a majority of the seats on RDG's board of directors.

88.    When API acquired RDH, it planned to grow RDH through leveraged buyouts of dental practices, and then sell it for profit in or around 2016.

89.    API grew RDH through leveraged acquisitions, but RDH's revenues were disappointing.

90.    In 2015, API caused RDG to be renamed and rebranded as NADG.  The same year, API recapitalized NADG.

91.    Riverside joined API as an investor in NADG, though API retained its controlling interest.

92.    API and Riverside's revised plan was to further grow NADG and then sell it in 2019.

93.    Increasing NADG's revenue became API and Riverside's primary objective.

94.    But in 2017, NADG floundered and it was forced to restructure and/or refinance its debt.

17

95.    In 2018, NADG's debt soared as a result of its aggressive leveraged acquisitions of many dozens of dental practices, yet NADG revenues were stagnant or declining, dragged down by several dozen low performing offices.

96.    As 2018 drew to an end, and still intending to sell NADG in 2019,[3] API, Riverside, Hunt, Rose and the NADG C-suite set out to rapidly increase NADG's revenues by all available means.

**B.    API, Riverside and NADG recruit Doyle and begin "sub-billing" to generate more revenue**

97.    In November, 2018, API and Riverside caused NADM to borrow money to finance an Asset Purchase Agreement with Doyle whereby NADM purchased the non-clinical assets of Doyle's CDC entities.

98.    Doyle received a substantial cash payment and an equity interest in NADM.

99.    NADM reemployed the employees of the CDC entities under related LLCs owned and controlled by NADM, all associated under the umbrella of Professional Dental Alliance, LLC (collectively "PDA entities").

100.    NADM entered service agreements with the CDC and PDA entities and linked them to NADM's practice management and claim submission software.

101.    API, Riverside and NADG then named Doyle President of NADM's Eastern Ohio and Pennsylvania Market, and the leader of NADM's "Optimization Team."

102.    In these roles, Doyle supervised, directed and controlled various NADM employees in Operations both at the Vice President and Regional Director levels, and, in coordination with API, Riverside, NADG, Matta, Cooper, Kerns, Conboy and Lester, directed

---

[3]    API and Riverside began circulating NADG's financial records to potential buyers in April or May, 2019.  In August, 2019, API and Riverside sold NADG to Jacobs Holding, a Swiss private equity firm.

and controlled how NADM acquired dental practices hired dentists, practiced dentistry and billed Medicaid for services.

103. Doyle was also given hiring and firing authority over NADM dentists.

104. Doyle had several ideas for increasing NADG's revenues which he promoted to Cooper, Matta, Kerns, Hunt and Rose.

105. Doyle's ideas included the scheme described in ¶ 1 and detailed more fully below. Insiders referred to this scheme as "Sub-billing" or "Supervised Billing" though it involved no supervision.

106. The sub-billing scheme arose from two mutually reinforcing economic pressures. First, there was pressure to generate revenue to service debt and pay management fees to Abry and Riverside. Second, there was pressure to generate revenue to meet the high monthly revenue goals set for NADM and its dental practices in anticipation of API's sale of NADG in 2019.

107. Consistent revenue generation at the practice level was a chronic problem due to dentist turnover and substantial delays in credentialing. The sub-billing scheme helped solve this problem by generating revenue the moment a new dentist was hired, long before the dentist was credentialed and eligible to submit claims for payment to insurance.

108. Doyle strongly believed the sub-billing scheme was justified. He cited the impossibility of meeting revenue targets in the absence of sub-billing, and also said it was widely known that Defendant Choksey had been billing services by other providers under his credentials for many years.

109. Doyle went over all this with Matta and Kerns. They told him that the "official" rule was "You're not allowed to do it." Yet they added, "But if you wanted to do it – wink, wink – here's how you do it."

19

110. Step 1 was to make sure both the credentialed dentist and the noncredentialed dentist "understand."

111. The noncredentialed dentist then treats the patient.

112. The credentialed dentist and/or office staff writes a treatment note falsely stating that the credentialed dentist treated the patient.

113. Conboy drew a Template for how the false treatment note should be written.

114. He showed it to Matta and Matta approved it.

115. Conboy said his Template was for eyeballs only and should not be sent out.

116. The treatment note designates the noncredentialed dentist by initials only which appear next to the name of the credentialed dentist, and falsely represents that the person to whom the initials belong assisted the credentialed dentist.

117. The procedure is then billed under the credentials of the participating provider.

118. The credentialed dentist benefits from the sub-billing scheme because he/she is paid for work he/she never performed.

119. The noncredentialed dentist benefits because he/she is paid a salary.[4]

120. At the time API, Riverside, Hunt, Rose, NADG and NADM recruited Doyle and at all times thereafter, they each knew, as did Matta, Cooper and Kerns among others, that a substantial portion of NADG's revenue came from Medicaid.

121. Medicaid revenues were centrally tracked and monitored on a daily basis across NADG as a whole, at the regional market level, at the level of individual offices, and at the level

---

[4] In point of fact, noncredentialed dentists demanded and received remuneration for their participation in the sub-billing scheme beyond their base salary. This remuneration took the form of credit toward revenue thresholds at which commissions on additional revenues beyond the threshold would be paid.

20

of individual dentists. This data was regularly presented to API, Riverside, Hunt and Rose at meetings of NADG's Board of Directors, in formal reports and in informal communications.

122.    API, Riverside, Hunt and Rose and the NADG C-Suite knew that as of December 31, 2018, Medicaid accounted for 13% or $31,500,000 of NADG's $243,000,000 annual revenue.

123.    API, Riverside, Hunt, Rose and the NADG C-Suite knew that approximately 1 out of every 4 patients across NADG was a Medicaid patient, that Medicaid patients accounted for 30-60% of all patients in Regional Markets such as Cleveland, Indiana, Michigan 1 and 2, Mahoning Valley, Steubenville and Toledo, and that Medicaid patients accounted for 60, 70 and even 85% or more of all patients at practice locations such as Refresh Dental Shaker Heights, Refresh Dental Willoughby Hills, DE Boardman South, DE Niles, DCI University Meadows, Refresh Dental Fort Wayne, Refresh Dental North Lima, Refresh Dental Poland, Refresh Dental Sebring, STV Dennison, CD Lewis and CD Oregon.

124.    Matta, Kerns, Doyle and Cooper presented the "RISE Methodology" to the NADG Board of Directors, including Hunt and Rose and representatives of Riverside, on February 21, 2019. The "RISE Methodology" summarized several of the techniques that NADG would use to increase revenues.

21

## RISE Methodology



125.    The sub-billing scheme was a key part of the RISE Methodology.

126.    API, Hunt, Rose and Riverside enthusiastically embraced the RISE Methodology and sub-billing scheme, agreed that they should be implemented as quickly as possible, made Doyle a senior officer in NADG and leader of the Optimization Team, and sent Doyle and the Optimization Team to numerous NADM dental offices to put the schemes into practice.

127.    API, Hunt, Rose and Riverside made these decisions because they were planning to exit their position with NADG in the near future.  Before any sale, they knew that potential buyers would first conduct a substantial due diligence to ensure that NADG was a sound investment.  API, Hunt, Rose and Riverside wanted to show buyers and lenders working with them both that NADG revenues were trending in a strong upward direction and that the right people and methods were in place to ensure that revenues would continue to be strong well into the future.

22

C.      **The sub-billing scheme is implemented in offices with high numbers of Medicaid patients**

128.    Among the offices to which API, Riverside, Cooper, Matta and Kerns deployed the Optimization Team were the Refresh Dental offices located in Kent, Medina, Middleburg Heights, Willoughby Hills and Shaker Heights, Ohio, and the Refresh Dental offices located in North Pointe, Southside Works, Cranberry Township, and Whitehall, Pennsylvania.

| Office | % of total patients covered by Medicaid 1/1/19 - 5/27/19 | Total Medicaid patients 1/1/19 - 5/27/19 | Average Medicaid patients/mo. 1/1/19 – 5/27/19 | Total Medicaid patients 1/1/19 through August, 2019 |
|---|---|---|---|---|
| Refresh Dental Kent | 39% | 676 | 135 | 1081 |
| Refresh Dental Medina | 40% | 1038 | 208 | 1662 |
| Refresh Dental Middleburg H. | 33% | 953 | 191 | 1526 |
| Refresh Dental Shaker Heights | 61% | 1548 | 310 | 2478 |
| Refresh Dental North Pointe | 18% | 444 | 89 | 711 |
| Refresh Dental Willoughby Hills | 70% | 994 | 199 | 1590 |
| Refresh Dental Southside Works | 28% | 412 | 82 | 658 |
| Refresh Dental Cranberry | 12% | 305 | 61 | 488 |
| Refresh Dental Whitehall | 20% | 1068 | 214 | 1710 |
| Total | | 7438 | | 11904 |

*Source: Daily Report (Open Dental) May 2019.xlsx*

129.    The Optimization Team, acting with the knowledge and approval of API, Riverside and the NADG C-Suite, directed O'Rourke and other RDOs to instruct new dentists, their staff and credentialed dentists who worked at the same office, that the new dentist's services were to be billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax

23

Identification number of the credentialed dentist. The RDOs delivered these instructions via email and telephone. They also explained how to falsify patient records.

130. By March 2019, the sub-billing scheme was profoundly successful in increasing revenue especially in the Cleveland Regional Market. The NADM dental offices at Kent, Medina, Middleburg, Shaker Heights and Westlake had operated deeply in red in nearly every month in the prior 12 months; after Doyle and his team got to work, the offices soared into profitability.

**4. PERFORMANCE TRENDS, NPR VS. BUDGET - CLEVELAND REGION, APR '19**

NORTH AMERICAN DENTAL GROUP

| | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | AUG '18 | SEP '18 | OCT '18 | NOV '18 | DEC18 | JAN '19 | FEB '19 | MAR '19 | APR '19 | T12M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KENT | $90 | ($20,997) | ($13,412) | ($20,239) | ($5,678) | $12,294 | ($21,630) | ($18,167) | ($24,133) | ($30,875) | $6,742 | ($25,793) | ($15,469) | $39,123 | $25,455 | ($379,372) |
| % | 0% | -21% | -14% | -24% | -6% | 13% | -22% | -24% | -24% | -12% | 9% | -27% | -16% | 40% | 24% | -7% |
| MADISON | 7,459 | 26,604 | (21,505) | (23,445) | (4,074) | (57,938) | (98,657) | (90,736) | (108,768) | (104,014) | (66,703) | (33,103) | (34,966) | (6,036) | (39,551) | ($683,601) |
| % | 5% | 18% | -13% | -16% | -3% | -40% | -63% | -65% | -60% | -65% | -51% | -37% | -33% | -6% | -34% | -42% |
| MEDINA | (23,792) | (20,374) | (28,980) | (40,001) | (24,552) | (4,931) | (25,584) | (20,711) | (21,495) | (30,567) | (18,371) | (83,616) | (42,538) | 41,775 | 32,294 | ($242,577) |
| % | -16% | -14% | -19% | -25% | -19% | -4% | -18% | -16% | -14% | -21% | -16% | -56% | -31% | 30% | 21% | -14% |
| MIDDLEBURG | (8,246) | 5,037 | (9,311) | 13,569 | (16,581) | (10,036) | (561) | (22,562) | (37,301) | 35,263 | (7,478) | (46,439) | 33,642 | 22,728 | 45,533 | $9,778 |
| % | -6% | 3% | -6% | 9% | -11% | -7% | 0% | -16% | -24% | 28% | -5% | -27% | 22% | 14% | 27% | 1% |
| SHAKER H. | (7,437) | (16,111) | (34,699) | (33,781) | (36,395) | (33,171) | (61,364) | (45,515) | (43,387) | (48,431) | (36,168) | (27,079) | 36,717 | 63,586 | 30,583 | ($236,425) |
| % | -7% | -14% | -32% | -29% | -35% | -36% | -52% | -46% | -36% | -40% | -36% | | 53% | 88% | 39% | |
| WESTLAKE | (12,911) | (24,194) | (18,391) | (27,713) | (33,166) | 1,777 | (1,234) | (31,828) | (31,535) | (45,251) | (10,602) | (34,574) | 44,326 | 87,248 | 45,528 | ($59,424) |
| % | -15% | -26% | -20% | -29% | -37% | 2% | -1% | -70% | -36% | -52% | -41% | -36% | 51% | 100% | 46% | -6% |

**5. PERFORMANCE TRENDS, NPR VS. LY - CLEVELAND REGION, APR '19**
* INCLUDES PRE-NADG FINANCIALS WHERE AVAILABLE

NORTH AMERICAN DENTAL GROUP

| | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | AUG '18 | SEP '18 | OCT '18 | NOV '18 | DEC18 | JAN '19 | FEB '19 | MAR '19 | APR '19 | T12M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KENT | $27,808 | ($8,519) | ($1,960) | ($10,740) | ($1,716) | $21,452 | $7,932 | $4,309 | ($11,517) | ($15,400) | $681 | ($27,431) | ($8,068) | $57,117 | $49,133 | $65,866 |
| % | 35% | -10% | -2% | -14% | -2% | 25% | 11% | 8% | -13% | -15% | 1% | -27% | -9% | 71% | 61% | 7% |
| MADISON | 506 | (1,019) | 12,742 | (5,809) | (38,310) | (44,478) | (63,757) | (111,649) | (39,077) | (97,554) | (90,298) | (100,440) | (98,740) | (82,980) | (71,561) | ($864,710) |
| % | 0% | -1% | 9% | -4% | -23% | -20% | -59% | -70% | -35% | -64% | -58% | -64% | -63% | -48% | -49% | -47% |
| MEDINA | 18,961 | (48,262) | (3,344) | (47,732) | (39,673) | 12,425 | (7,482) | (28,979) | (25,037) | (36,470) | (35,325) | (78,119) | (26,514) | 54,314 | 66,850 | ($191,752) |
| % | 19% | -27% | -3% | -29% | -39% | 11% | -5% | -21% | -16% | -24% | -27% | -54% | -22% | 42% | 56% | -14% |
| MIDDLEBURG | (5,914) | 6,336 | 14,587 | 1,304 | (7,475) | (27,639) | 8,917 | 11,921 | (15,860) | 29,002 | (17,322) | (36,924) | 35,492 | 16,555 | 67,809 | $64,679 |
| % | -4% | 4% | 11% | 1% | -5% | -17% | 7% | 11% | -12% | 22% | -12% | -31% | 41% | 9% | 47% | 4% |
| SHAKER H. | (11,706) | (34,223) | (40,624) | (40,679) | (46,557) | (20,399) | (53,824) | (29,465) | (41,168) | (59,839) | (51,582) | (40,560) | 8,449 | 40,207 | 34,658 | ($300,561) |
| % | -11% | -26% | -35% | -33% | -41% | -25% | -47% | -35% | -35% | -50% | -43% | -45% | 9% | 42% | 46% | -25% |
| WESTLAKE | (12,395) | (26,140) | (16,763) | (33,587) | (23,363) | 8,512 | (4,915) | (16,197) | (5,440) | (28,933) | (24,530) | (16,074) | 57,300 | 104,574 | 72,431 | $87,779 |
| % | -14% | -27% | -19% | -34% | -29% | 9% | -5% | -24% | -8% | -41% | -18% | -21% | 78% | 149% | 100% | 10% |

131. Cooper, Doyle and Kerns agreed that the impact of sub-billing was "huge," and discussed plans to push it in other regional markets both on the telephone and via email.

132. In the meantime, API, Hunt, Rose and Riverside directed Cooper, Matta, Doyle and other NADG executives to generate even more revenue.

24

134. In 2019, pursuant to the sub-billing scheme:

   a. Services by Bazin while he was noncredentialed at the Refresh Dental Shaker Heights office were billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax Identification number of Wilson;

   b. Services by Snyder while he was noncredentialed at the Refresh Dental Middleburg Heights office were billed to Medicaid under the names, NPIs Ohio Medicaid numbers and Tax Identification numbers of Okezie and Matta;

   c. Services by Conboy and Doyle while noncredentialed at the Refresh Dental Middleburg Heights office were billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax Identification number of Matta;

   d. Services by Haghighi while he was noncredentialed at the Refresh Dental Middleburg Heights office were billed to Medicaid under the names, numbers and Ohio Medicaid numbers of Okezie and Snyder;

   e. Services by Haghighi while he was noncredentialed at the Refresh Dental Willoughby Hills office were billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax Identification number of Kolosionek;

   f. Services by Marshall while he was noncredentialed at the Refresh Dental Medina office (in 2020) were billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax Identification number of Lu;

   g. Services by Conboy while he was noncredentialed at the Refresh Dental Medina office were billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax Identification number of Lu;

   h. Services by Wilson while he was noncredentialed at the Refresh Dental Shaker Heights office were billed to Medicaid under the names, NPI, Ohio Medicaid numbers and Tax Identification numbers of Zimmerman, Foote and Kolosionek;

   i. Services by Conboy and Doyle while noncredentialed at the Refresh Dental Shaker Heights office were billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax Identification number of Zimmerman; and,

   j. Services by Bazin, Snyder, Haghighi, Marshall and Wilson while they were noncredentialed at the Refresh Dental Kent office were billed to Medicaid under the name, NPI, Ohio Medicaid number and Tax Identification number of Doyle.

**D.    Representative False Claims**

135.    Approximately 61% of the patients seen at the Refresh Dental Shaker Heights office where Zimmerman worked were covered by Medicaid.

136.    Relator used data from OpenDental to track the revenue from services Wilson performed while noncredentialed that were billed under Zimmerman's name and credentials.

137.    In March, 2019, 70 separate false claims for payment totaling $12,704.00 were submitted to insurance under Zimmerman's name, NPI and other credentials for services that were actually performed by Wilson.  Approximately 61% of these false claims were fraudulently submitted to the Medicaid program.

138.    In April 2019, 158 separate false claims for payment totaling $39,992.00 were submitted to insurance under Zimmerman's name, NPI and other credentials for services that were actually performed by Wilson.  Approximately 61% of these false claims were fraudulently submitted to the Medicaid program.

139.    In May, 2019, 285 separate false claims for payment totaling $67,450.00 were submitted to insurance under Zimmerman's name, NPI and other credentials for services that were actually performed by Wilson.  Approximately 61% of these false claims were fraudulently submitted to the Medicaid program.

140.    In June, 2019, 368 separate claims for payment totaling $95,069.00 were submitted to insurance under Zimmerman's name, NPI and other credentials for services that were actually performed Wilson.  Approximately 61% of these false claims were fraudulently submitted to the Medicaid program.

141.    Representative false or fraudulent claims in March, April, May and June, 2019 submitted under Zimmerman's name, NPI and other credentials for services Wilson performed

26

while noncredentialed are set forth in Exhibit 1 and are incorporated herein as though set forth in full.

142.    Based on currently available information from NADG records regarding the ratio of Medicaid patients to total patients at the Shaker Heights office, 537 of the 881 false claims documented in Exhibit 1 were submitted to Medicaid based on services that Wilson provided to 238 Medicaid patients.  The actual number of false claims to using Zimmerman's credentials may be substantially higher.  NADG and NADM are in exclusive possession of the documents and electronic records needed to more precisely quantify the number.

143.    Each of the false claims for payment in Exhibit 1 was submitted electronically through NADM/NADG's Electronic Data Interchange portal ClaimConnect maintained at www.dentalxchange.com with the knowledge and approval of API, Riverside, Hunt, Rose, Zimmerman, Wilson, Doyle, Conboy, Matta, Cooper, Lester, Kerns, NADM and NADG among others.

144.    Each false or fraudulent claim presented to Medicaid had the unlawful purpose and effect of causing the United States to pay out money it did not owe.

145.    The representative false or fraudulent claims identified in Exhibit 1 are the tip of the iceberg.  They reflect only small fraction of the total number of false or fraudulent claims Defendants submitted or caused to be submitted to the Medicaid program pursuant to the fraudulent sub-billing scheme.

146.    On a busy day, a single dentist might have 20 or so patient appointments.  Over the course of a busy month, a very busy dentist might have approximately 400 patient appointments.

147.    According to an NADM/NADG Production Report, in April 2019, the dentists with the highest number of patient appointments were as follows:

| Region | Dentist | Office | Total monthly appointments |
|---|---|---|---|
| Cleveland | Zimmerman | Shaker Heights | 621 |
| Columbus 1 | Steven Lee | Hebron | 648 |
| Columbus 2 | Spencer Tape | Ashland | 498 |
| Connecticut | Carolina Giraldo | Norwalk | 484 |
| Florida 1 | M. Mujeeb | Lake Washington | 447 |
| Florida 2 | Donald Black | St. Petersburg | 399 |
| Georgia 1 | Ismael Salvador | Covington | 584 |
| Georgia 3 | Edwin Hargett | C. Vinson | 536 |
| Indiana | Dan Krueger | Life Smiles | 402 |
| Mahoning | James Lucido | Alliance | 685 |
| Michigan 1 | S. Sivaraman | Southfield | 639 |
| New York | Sai Guduru | Penn Yan | 414 |
| | | | |
| **Mean appointments per month** | | | 528 |
| **Mean appointments per day** | | | 26 |

148.    For the NADM/NADG regional markets identified above, the busiest dentists – those with the highest number of monthly appointments in each respective regional market – averaged 528 appointments in the month of April 2019 with an average daily patient appointment rate of 26 patients.[5]

149.    Compared to these numbers, Defendants Choi, Choksey, Morocho, Dhariwal and Hawazin claimed to have 1,089, 943, 933, 842 and 970 patient appointments respectively in the

---

[5]    The true average number of monthly appointments per dentist per regional market is substantially lower than 528. Many dentists in each regional market had monthly patient appointments in the 100-300 range. Also, Zimmerman's reported April 2019 patient appointments were artificially inflated by a number of patient appointments that were actually handled by Wilson.

month of April 2019. That translates to 54, 47, 46, 42 and 49 patient appointments every business day of the month for an average daily patient appointment rate of 48.

150. It is not possible for a dentist to see 48 patients in a day, let alone 48 patients each and every business day for an entire month.

151. Choi, Choksey, Dhariwal and Morocho all worked out of the Corner Dental Talmadge office where approximately 50% of the patients were Medicaid patients.

152. Hawazin worked out of the Dental Care of Michigan Advanced Warren office where approximately 43% of the patients were Medicaid patients.

153. There is no explanation for Choi, Choksey, Morocho, Dhariwal and Hawazin' s April 2019 patient appointment totals except that noncredentialed dentists were being billed under their names, NPI numbers and Medicaid numbers, and that each dentist was receiving payment from Medicaid for services he never performed and that were not eligible to be reimbursed.

| Office | % of total patients covered by Medicaid 1/1/19 - 5/27/19 | Total Medicaid patients 1/1/19 - 5/27/19 | Average Medicaid patients/mo. 1/1/19 – 5/27/19 | Total Medicaid patients 1/1/19 through August, 2019 |
|---|---|---|---|---|
| **Corner Dental Talmadge** | 50% | 2,756 | 551 | 4,410 |
| **Dental Care of MI Advanced Warren** | 43% | 1,685 | 337 | 2,696 |

*Source: Daily Report (Open Dental) May 2019.xlsx*

154. The actual number of patient appointments for Choi, Choksey, Morocho, Dhariwal and Hawazin in April 2019 was much closer to the busy dentist average of 528 appointments than to the extraordinary numbers these Defendants claimed. Unlawful sub-billing

29

accounts for the difference between their reported monthly patient appointments and their expected actual monthly patient appointments.

155.    More specifically, sub-billing accounted for 561 of Choi's claimed April 2019 patient appointments, 415 of Choksey's claimed April 2019 patient appointments, 405 of Morocho's claimed April 2019 patient appointments, 314 of Dhariwal's claimed April 2019 patient appointments, and 442 of Hawazin's claimed April 2019 patient appointments.

156.    Applying the Medicaid patient rates at each office, in the month of April 2019 alone, dentists who were not credentialed by Medicaid provided services to 848 Medicaid patients at the Corner Dental Talmadge office, which services were falsely and fraudulently billed to Medicaid under the names, NPIs, Medicaid numbers and tax identification numbers of Choi, Choksey, Morocho and Dhariwal.  Dentists who were not credentialed by Medicaid provided services to 190 Medicaid patients at the Dental Care of Michigan Advanced Warren office, which services were falsely and fraudulently billed to Medicaid under the name, NPI, Medicaid number and tax identification number of Hawazin.[6]

157.    The United States pursues both civil and criminal actions against persons and entities who perpetrate fraud on the federal government, including actions against private equity firms, dentists and office staff.

158.    On January 16, 2020, a federal grand jury in Boston indicted Dr. Anthony DiStefano, Dr. Scott Cale and office manager Robin Cronin for their participation in a scheme to defraud the Massachusetts Medicaid program, commonly known as MassHealth.  According to

---

[6]    Claims to Michigan Medicaid for services by non-enrolled providers are not reimbursable.  See, Michigan Department of Health and Human Services Medicaid Provider Manual, Billing and Reimbursement for Professionals, Jan. 1, 2020, § 2.3.A ("The billing provider must be enrolled with the program for payment.  If the billing provider NPI reported is an invalid number and/or represents a non-enrolled provider, the entire claim will be denied for payment.").

30

the indictment, in 2005, MassHealth excluded DiStefano from participation in the MassHealth program. To circumvent his exclusion, DiStefano recruited Cale to join his practice. From 2014 to 2018, dental services that DiStefano personally delivered were billed to MassHealth using Cale's provider identification credentials. Cale then paid DiStefano a share of the money that MassHealth paid Cale. The purpose of this arrangement was to deceive MassHealth into paying for dental services that were not reimbursable. Cronin, DiStefano's office manager, was aware of the arrangement and personally billed MassHealth for services that were not reimbursable, knowing that the claims were false.

159. The United States prosecuted Dr. Oluwatoyin Solarin for filing false claims with the Georgia Medicaid program for services that he did not perform and for services that were not eligible to be reimbursed. Dr. Solarin pled guilty in 2016 and was sentenced to 18 months in federal prison in 2017.

160. The United States prosecuted Dr. Robert Rouzaud, a Cleveland dentist, on charges of Medicaid fraud arising from services he billed for but did not perform. The United States Attorney who prosecuted Rouzaud said that "This dentists fraudulent actions were egregious, and he deserves to go to prison for stealing from taxpayers." Rouzaud was sentenced to 12 months in prison.

161. In *U.S. ex. Rel. Medrano v. Diabetic Care Rx, LLC et al.*, No. 15-62617 (S.D.Fla.), the United States intervened and asserted claims under the False Claims Act against the private equity firm that knowingly caused the submission of false claims to TRICARE through its portfolio company.

31

## COUNT I – 31 U.S.C. § 3729(a)(1)(A)

### False or Fraudulent Claims
### Billing nonreimbursable services and lying about the provider

162.    The United States re-alleges and incorporates by reference the allegations set forth above.

163.    The United States asserts this Count against each organizational Defendant and Defendants Doyle, Cooper, Matta, Conboy, Kerns, Lester, Hunt, Rose, Zimmerman, Wilson, Foote, Kolosionek, Bazin, Snyder, Okezie, Haghigi, Marshall, Lu, Choi, Choksey, Morocho, Dhariwal and Khedher, in their personal capacities and capacities as owners, officers or employees.

164.    Count I Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States in 2019 and 2020 in violation of 31 U.S.C. § 3729(a)(1)(A).[7]

165.    By virtue of their detailed knowledge and control over their portfolio company and its acquisitions, and their knowledge of the number and percentages of Medicaid patients treated inside NADG, API, Riverside, Hunt, Rose and the NADG C-Suite knew that the sub-billing scheme was substantially certain to result in false or fraudulent claims being submitted to Medicaid, and to result in the making or use of false or fraudulent statements or records material to false or fraudulent claims submitted to Medicaid.

---

[7]    Each knowing submission of a false or fraudulent claim is a separate violation of the False Claims Act.  31 U.S.C. § 3729(a)(2).  The number of violations of the False Claims Act depends on the number of false or fraudulent claims that a defendant submits or causes to be submitted.  A penalty is assessed per false claim.  *See, United States v. Bornstein*, 423 U.S. 303, 313 (1976); *United States v. Killough*, 848 F.2d 1523, 1533 (11th Cir. 1988) (holding that each separate fraudulent submission by a defendant demanding payment by the government is a "claim" within the meaning of the FCA).

166.    The knowingly false claims were presented electronically by office staff, typically the Office Manager or front desk personnel, at each of the locations where the individual Defendant dentists practiced using the ClaimConnect EDI portal at www.dentalxchange.com that NADM/NADG provided to each dental office.

167.    In preparing to submit claims to Medicaid for ineligible services provided by noncredentialed dentists, office staff selected dentists who were credentialed by the Medicaid program from the drop-down menu on ClaimConnect, even though they knew that the dentist they were selecting and were about to report to Medicaid as the service provider had not performed the services.

168.    Once the name of the credentialed dentist was falsely selected on ClaimConnect, the software populated his or her NPI, Ohio Medicaid number and Tax Identification number on the claim form.

169.    The office staff who aided and abetted the Count I Defendants in defrauding Medicaid were acting on the orders, directions and instructions of the Count I Defendants.

170.    It was NADM/NADG policy to submit claims for payment to the Medicaid program on a nightly basis.

171.    The Count I Defendants who did not directly present the foregoing false or fraudulent claims for payment each created, approved and/or personally participated in the sub-billing scheme, which they knew would, if successful, result in the submission of false or fraudulent claims to Medicaid.

172.    From their training, the onboarding they received, and their knowledge of the dental business, Wilson, Haghighi, Kolosionek, Marshall, Bazin and Snyder knew that the

services they were performing on Ohio Medicaid patients before they had been credentialed were not eligible to be billed to Ohio Medicaid.

173.   As a condition of their participation in the fraudulent sub-billing scheme, these Defendants solicited and received credits toward their commission thresholds for the full amount of collections on services they performed while noncredentialed.

174.   At all relevant times, Zimmerman, Foote, Kolosionek, Okezie, Snyder, Lu, Wilson, Marshall, Doyle, Choi, Choksey, Morocho, Dhariwal and Khedher knew that their names, NPI, Ohio Medicaid numbers and Tax Identification numbers were being used to bill Ohio Medicaid for services performed by noncredentialed dentists because, inter alia, they authorized their credentials to be so used, personally falsified the patient's treatment records or approved of the falsification of the patient's treatment records to conceal the fraud, and because they received cash payments for services performed by the noncredentialed dentists.

175.   As the direct result of Count I Defendants' conduct, the United States paid claims that it otherwise would have denied.

176.   By reason of these payments, the United States has been damaged.

177.   Count I Defendants presented the false or fraudulent claims with actual knowledge of their falsity, in deliberate ignorance of their truth or falsity, in reckless disregard of their truth or falsity.

**COUNT II – 31 U.S.C. § 3729(a)(1)(A)**

**False or Fraudulent Claims - Anti-Kickback Statute
Paying, soliciting and receiving bribes for prohibited referrals**

178.   The United States re-alleges and incorporates by reference the allegations set forth above.

34

179.    The United States asserts this Count against Zimmerman, Foote, Kolosionek, Okezie, Snyder, Lu, Wilson, Marshall, Doyle, Choi, Choksey, Morocho, Dhariwal and Khedher, and NADM and NADG, whether acting directly or through an acquired entity or a controlled and related LLC.

180.    Zimmerman, Foote, Kolosionek, Okezie, Snyder, Lu, Wilson, Marshall, Doyle, Choi, Choksey, Morocho, Dhariwal and Khedher referred patients to noncredentialed dentists within the meaning of the AKS because they directed, steered and/or authorized the patient's care by the noncredentialed dentists.

181.    Zimmerman, Foote, Kolosionek, Okezie, Snyder, Lu, Wilson, Marshall, Doyle, Choi, Choksey, Morocho, Dhariwal and Khedher solicited or received remuneration for their referrals in the form of payments for the nonreimbursable services provided by the noncredentialed dentists.

182.    NADM offered and paid remuneration to Zimmerman, Foote, Kolosionek, Okezie, Snyder, Lu, Wilson, Marshall, Doyle, Choi, Choksey, Morocho, Dhariwal and Khedher to induce them to make referrals to the noncredentialed dentists for the purpose of providing nonreimbursable services to Medicaid patients and billing those services to Medicaid.

183.    The non-organizational Count II Defendants who knowingly (a) referred their patients to noncredentialed dentists, and knowingly (b) permitted their credentials to be used to bill Medicaid for the services of the noncredentialed dentists, knowingly caused the submission of claims for payment to Medicaid that were false or fraudulent and not payable because these Defendants knowingly and willfully received remuneration in return for their acts set for the in (a) and (b) above.

35

184.    NADM and NADG knowingly caused the submission of claims for payment to Medicaid that were false or fraudulent and not payable because it knowingly and willfully paid remuneration to the credentialed dentists identified above in exchange for them referring their patients to noncredentialed dentists and permitting their credentials to be used to bill Medicaid for services performed by the noncredentialed dentists.

185.    As the direct result of Count II Defendants' conduct, the United States paid claims that it otherwise would have denied.

186.    By reason of these payments, the United States has been damaged.

187.    Count II Defendants presented the false or fraudulent claims with actual knowledge of their falsity, in deliberate ignorance of their truth or falsity, in reckless disregard of their truth or falsity.

## COUNT III – 31 U.S.C. § 3729(a)(1)(B)

### False Records or Statements Material to False Claims

188.    The United States re-alleges and incorporates by reference the allegations set forth above.

189.    The United States asserts this Count against the organizational Defendants and individual Defendants Hunt, Rose, Cooper, Doyle, Matta, Conboy, Kerns, Lester, Wilson, Foote, Kolosionek, Bazin, Snyder, Okezie, Haghigi, Marshall Lu, Choi, Choksey, Morocho, Dhariwal and Khedher, in their personal capacities and capacities as owners, officers or employees.

190.    Count III Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B), including but not limited to:

36

a.    False statements in a patient's records that a patient had an appointment with a credentialed dentist, when in fact the patient had an appointment with a noncredentialed dentist;

b.    False statements in a patient's records that a clinical examination was performed by a credentialed dentist when in fact it was performed by a noncredentialed dentist;

c.    False statements in a patient's records that a diagnosis was made by a credentialed dentist when in fact the diagnosis was made by a noncredentialed dentist;

d.    False statements in a patient's records that a treatment plan was developed by a credentialed dentist when in fact it was developed by a noncredentialed dentist;

e.    False statements in a patient's records that a credentialed dentist had performed coded treatment(s) when in fact a noncredentialed dentist had performed the services;

f.    False statements in a patient's records that a person identified solely by their initials had assisted a credentialed dentist in performing the services, when that person was in fact a noncredentialed dentist who had performed all of the services;

g.    Making and using false patient records that concealed and failed to disclose the identity of the noncredentialed dentist who had performed the services;

h.    Falsely using the name of a credentialed dentist who had not performed the services in claims for payment presented to the Ohio Medicaid program;

i.    Falsely using the NPI of a credentialed dentist who had not performed the services in claims for payment presented to the Ohio Medicaid program;

j.    Falsely using the Ohio Medicaid number of a credentialed dentist who had not performed the services in claims for payment presented to the Ohio Medicaid program;

k.    Falsely using the Taxpayer Identification number of a credentialed dentist who had not performed the services in claims for payment presented to the Ohio Medicaid program;

l.    Falsely representing that the services described by payment/procedure codes and other means were performed by the dentist under whose name, NPI, Ohio Medicaid number and Tax Identification number the claims were submitted;

37

m.    Falsely certifying that the information on the claims for payment presented to Medicaid was "true, accurate and complete" 42 C.F.R. § 455.18(a)(1);

n.    Falsely certifying that Defendants were in compliance with applicable federal and state regulations that were material conditions to the payment of claims submitted to Medicaid, including:

    1.    Falsely certifying compliance with the Provider Agreement of the credentialed dentist who did not perform the services;

    2.    Falsely certifying that the credentialed dentist had actually performed the services; and,

    3.    Falsely certifying that Defendants maintained all records necessary and in such form as to fully disclose the extent of services provided; and,

o.    Failing to disclose that the services were actually performed by a noncredentialed dentist who was ineligible to bill the Ohio Medicaid program.

191.    The foregoing false statements, false records, misrepresentations and failures to disclose were each material to Medicaid's decisions to approve and pay the claims submitted.

192.    The foregoing false statements, false records, misrepresentations and failures to disclose had a natural tendency to influence or were capable of influencing Medicaid's payment decisions.

193.    The United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid claims that it otherwise would have denied had it known the truth.

194.    By reason of these payments, the United States has been damaged.

195.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT IV – 31 U.S.C. § 3729(a)(1)(G)

### Knowingly concealing or avoiding
### obligation to pay money to the United States

196.    The United States re-alleges and incorporates by reference the allegations set forth above.

197.    The United States asserts this Count against the Count I and Count III Defendants.

198.    Count IV Defendants failed to report and return the overpayments described in this Complaint

199.    Count IV Defendants failed to notify appropriate authorities in writing of the reasons for the overpayments.

200.    To the extent the Count IV Defendants reported and returned any overpayments, they did so outside the statutory deadline for same.

201.    To the extent the Count IV Defendants reported and returned any overpayments, they lied about and/or concealed the reasons for the overpayments.

202.    The Count IV Defendants knowingly violated their reporting and repayment obligations under federal law.

## COUNT V – 31 U.S.C. § 3729(a)(1)(C)

### Conspiracy

203.    The United States re-alleges and incorporates by reference the allegations set forth above.

204.    The United States asserts this count against all Defendants.

205.    Each Defendant came to an agreement, mutual understanding or meeting of the minds with one or more other persons to accomplish common objectives unlawful under §§ 3729(a)(1)(A), (B) and (G).

39

206.    Each Defendant and/or at least one person co-conspiring with each Defendant committed an overt act in furtherance of the conspiracy.

207.    By virtue of the false or fraudulent claims that the Defendants conspired to present or cause to be presented, and by virtue of the false records or statements material to false or fraudulent claims that the Defendants conspired to make, use, or cause to be made or used, the United States suffered actual damages in an amount to be determined at trial.

208.    By virtue of the Defendants' conspiracy to violate 42 U.S. Code § 1320a–7k(d), the United States suffered actual damages in an amount to be determined at trial.

**WHEREFORE**, Relator and the United States demand:

a.    Judgment in favor or the United States against Defendants jointly and severally for mandatory statutory penalties in an amount not less than $10,781 and not more than $21,563 (or the inflation adjusted penalties following trial) for each violation of §§ 3729(a)(a)(A), (B) and (C);[8]

b.    Judgment in favor of the United States for in an amount equal to three times the damages the United States sustained because of Defendants' violations;

c.    Judgment in favor of the United States for costs and attorney fees;

d.    Judgment in favor of Relator for costs and attorney fees;

e.    For Relator, 15-25% of the proceeds of the action or of any settlement in the event the United States chooses to intervene and proceed with the action;

---

[8]    The penalty is mandatory. *See United States v. Hughes*, 585 F.2d 284, 286 (7th Cir. 1978); *Killough*, 848 F.2d at 1533-34. The legislative history to the 1986 Amendments to the FCA explains that "[t]he imposition of this forfeiture is automatic and mandatory for each claim which is found to be false. The United States is entitled to recover such forfeiture solely upon proof that false claims were made, without proof of any damages.... A forfeiture may be recovered from one who submits a false claim even though no payments were made on the claim." S. Rep. No. 345, 99th Cong., 2d Sess. at 8 (July 28, 1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273 (internal citation omitted). *See also, Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426, 429 (6th Cir. 2001) ("recovery under the FCA is not dependent upon the Government's sustaining monetary damages"); *see also United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("No damages need be shown in order to recover the penalty.") (citing *Rex Trailer Co. v. United States*, 350 U.S. 148, 153 n.5 (1956)).

40

f.      For Relator, 25-30% of the proceeds of the action or of any settlement in the event the United States does not intervene and proceed with the action;

g.      For Relator, a share pursuant to 31 U.S.C. § 3730(c)(5) of any alternative remedy that the United States Government elects to pursue;

h.      For Relator and the United States, pre- and post-judgment interest;

i.      That Defendants be permanently enjoined from the unlawful acts that form the basis of this lawsuit; and,

j.      All other relief to which Relator and the United States are entitled at law and equity.

Respectfully submitted,

s/ Charles A. Lamberton
Lamberton Law Firm, LLC
Pa. I.D. No. 78043
707 Grant Street, 1705 Gulf Tower
Pittsburgh, PA  15219
412-258-2250 - O
412-498-4120 - C (24/7)
cal@lambertonlaw.com

Robert A. Bracken
BRACKEN LAW FIRM, LLC
Pa. I.D. No. 206095
BNY Mellon Center
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
Tel  412.278.7402
Fax  412.533.7030

April 16, 2020